IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Romona Yvette Gourdine *and* Randolph Gourdine, Jr., | ) | Civil Action No. 2:14-4839-RMG |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Karl Storz Endoscopy-America, Inc., | ) | |
| *a California corporation, and* Karl Storz | ) | |
| GmbH & Co. KG, *organized in Germany*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Defendant Karl Storz GmbH & Co KG ("KST")
motion to dismiss for lack of personal jurisdiction. For the reasons set forth below, the Court
denies the motion to dismiss.

I. **Background**

This is a product liability action brought within the Court's diversity jurisdiction. Plaintiff
Romona Yvette Gourdine underwent a supra-cervical hysterectomy on December 28, 2011.
(Compl. ¶ 12, Dec. 23, 2014, Dkt. No. 1.) The surgeon removed fibroids from her uterus and
broad ligament using a device known as a morcellator. (*Id.*) Plaintiffs allege that the use of the
morcellator potentially disseminated cancerous cells throughout Ms. Gourdine's abdomen,
worsened her prognosis, and forced her to undergo radiation therapy. (*Id.* ¶¶ 13, 16.) Plaintiffs
further allege that Defendants knew or should have known of this risk and failed to communicate
the risks to physicians and patients. (*Id.* ¶¶ 12–25.) Defendant KST, a German company, allegedly
manufactured the morcellator used. Defendant Karl Storz Endoscopy-America, Inc. ("KSEA"), a
California company, is a subsidiary of KST that markets and distributes the devices within the
United States. Plaintiffs bring claims for negligence, defective manufacturing, design defect,

failure to warn, strict liability, breach of implied warranty, personal injury, breach of express warranty, negligent misrepresentation, fraudulent misrepresentation, fraud by concealment, and loss of consortium. (*Id.* ¶¶ 26–124.) The parties dispute the Court's jurisdiction over KST, but the Court's jurisdiction KSEA is uncontested.

KST moved for dismissal for lack of personal jurisdiction on July 13, 2015. (Def.'s Mot. to Dismiss, Dkt. No. 25.) Jurisdictional discovery took place from about that time until September 18, 2015. (Order, Aug. 20, 2015, Dkt. No. 31.) On November 6, 2015, the Court granted the motion in part and denied it in part. (Order, Dkt. No. 42.) The Court denied the motion to dismiss without prejudice, and ordered further jurisdictional discovery to be completed by January 4, 2016, followed by a renewed motion to dismiss for lack of personal jurisdiction, to be filed by February 4, 2016. (*Id.*)

On February 4, 2016, KST its renewed motion to dismiss. (Def.'s Mot. to Dismiss, Dkt. No. 51.) Thereafter, the Court allowed a final deposition, jurisdictional discovery closed, and briefing on KST's renewed motion to dismiss for lack of personal jurisdiction completed. (Order, Feb. 23, 2016, Dkt. No. 55.)

## II.    **Legal Standard**

When a court's personal jurisdiction is challenged, the burden is on the plaintiff to establish that a ground for jurisdiction exists. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When the court resolves the motion on written submissions (as opposed to an evidentiary hearing), the plaintiff need only make a "prima facie showing of a sufficient jurisdictional basis." *Id.* However, the plaintiff's showing must be based on specific facts set forth in the record. *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992). The Court may consider the parties' pleadings, affidavits, and other supporting documents but must construe them "in the light most favorable to plaintiff, drawing all inferences and resolving all factual disputes in his favor,

-2-

2:14-cv-04839-RMG    Date Filed 05/02/16    Entry Number 61    Page 3 of 32

and assuming plaintiff's credibility." *Sonoco Prods. Co. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 404–05 (D.S.C. 2012) (internal quotation and alteration marks omitted); *see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) ("In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff."). However, a court "need not credit conclusory allegations or draw farfetched inferences." *Sonoco*, 877 F. Supp. 2d at 205 (internal quotation marks omitted).

KST argues that the completion of jurisdictional discovery should raise the legal standard, requiring Plaintiffs to prove that personal jurisdiction is appropriate by a preponderance of the evidence, rather than requiring only a *prima facie* showing. (Dkt. No. 51-1 at 6–7.) This Court was presented with an identical argument in *Schreiner v. Patriarch Partners, LLC*, where it observed that the Fourth Circuit distinguishes between personal jurisdiction decisions based on motion papers and those based on an evidentiary hearing without stating whether jurisdictional discovery makes a district court's consideration more like an evidentiary hearing and so changes the burden of proof. Civ. No. 2:14-220-RMG, 2014 WL 11034777, at *3 (D.S.C. Nov. 7, 2014). In *Schreiner*, the Court did not need to answer that question. The Court now reaches the question and concludes that the completion of jurisdictional discovery requires Plaintiffs to prove personal jurisdiction by a preponderance of the evidence. That conclusion is the most logical reading of *Combs*. The Fourth Circuit distinguished between a court determining jurisdiction "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint," when it "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction," and a court determining jurisdiction by considering evidence on "disputed factual questions," when the plaintiff must "prove the existence of a ground for jurisdiction by a preponderance of the

-3-

evidence." *Combs*, 886 F.2d at 676. By "motion papers," the Fourth Circuit clearly means legal arguments regarding assumed facts—*e.g.*, the method by which parties argue Rule 12(b)(6) motions. The purpose of jurisdictional discovery is to give the parties the opportunity to *prove* facts. It would be illogical for the Court to allow extended discovery of jurisdictional facts and then to rule on jurisdiction based on allegations and assumptions rather than facts supported by discovered evidence. *Cf. Brown v. Geha-Werke GmbH*, 69 F. Supp. 2d 770, 774 (D.S.C. 1999) ("Although this court decided the issue of personal jurisdiction without an evidentiary hearing . . . the parties have engaged in jurisdictional discovery and offered evidence beyond the pleadings and affidavits. Consequently, the jurisdictional information before the court is more like that presented at an evidentiary hearing . . . [therefore] Plaintiff must establish personal jurisdiction by a preponderance of the evidence.").

However, "[i]f the jurisdictional facts 'are so intertwined with the facts upon which the ultimate issues on the merits must be resolved,' then "'the entire factual dispute is appropriately resolved only by a proceeding on the merits.'" *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219–20 (4th Cir. 1982) (citation omitted) (regarding subject-matter jurisdiction). In such case, a district court may assume jurisdiction, reserve the question of jurisdiction, and determine relevant jurisdictional facts on a motion going to the merits or at trial. *See United States v. North Carolina*, 180 F.3d 574, 580 (4th Cir. 1999) (regarding subject-matter jurisdiction).

To meet their burden, Plaintiffs must show (1) that South Carolina's long-arm statute authorizes jurisdiction, and (2) that the exercise of personal jurisdiction complies with the constitutional due process requirements. *E.g.*, *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). South Carolina has interpreted its long-arm

statute to extend to the constitutional limits of due process. *See S. Plastics Co. v. S. Commerce Bank*, 423 S.E.2d 128, 130–31 (S.C. 1992). Thus, the first step is collapsed into the second, and the only inquiry before the court is whether the due process requirements are met. *ESAB Group, Inc. v. Centricut, LLC*, 34 F. Supp. 2d 323, 328 (D.S.C. 1999); *Sonoco Prods. Co. v. Inteplast Corp.*, 867 F. Supp. 352, 352 (D.S.C. 1994).

Due process requires that a defendant have sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This standard can be met in two ways: "by finding specific jurisdiction based on conduct connected to the suit or by finding general jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711–12 (4th Cir. 2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Plaintiffs do not claim that the Court has general personal jurisdiction over KST. (Pls.' Resp. Mot. Dismiss 11, Mar. 15, 2016, Dkt. No. 56.) To determine whether specific jurisdiction exists, the Court considers "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md.*, 334 F.3d at 397 (citing *ALS Scan*, 293 F.3d at 711–12; *Helicopteros Nacionales de Colombia*, 466 U.S. at 414 & n.8). In other words, the defendant must have "minimum contacts" with the forum, *see Burger King*, 471 U.S. at 471–76, the cause of action must arise from those contacts, and the exercise of personal jurisdiction must be reasonable. Courts evaluate the reasonableness of personal jurisdiction by considering "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as

between states, and (e) the shared interests of the several states in furthering substantive social policies." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 946 (4th Cir. 1994). "Minimum contacts" and "reasonableness" are not independent requirements; rather, they are aspects of the requirement of due process, and thus "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477.

## III.   **Findings of Fact**

The issue of personal jurisdiction over KST hinges, in part, on certain disputed issues of fact. The parties, after approximately eight months of jurisdictional discovery, have submitted witness declarations, deposition transcripts, interrogatory responses, and documentary evidence in support of their factual contentions. After careful review of the record, the Court makes the following findings of fact.

1.     KST is a closely-held Germany company owned by the Storz family. (Decl. of Helmut Wehrstein ¶ 2, Undated, Dkt. No. 51-2.) KST was founded in 1945. *Our Journey-History from 1945*, Karl Storz Endoskope, https://www.karlstorz.com/af/en/history.htm. KST does not maintain offices in South Carolina, and it is not registered to do business in South Carolina. (Wehrstein Decl. ¶ 3.)

2.     KST's business is the design, manufacture, marketing, and sale of endoscopic instruments. *See Our Company*, Karl Storz Endoskope, https://www.karlstorz.com/af/en/corporation.htm; *Our Product Range*, Karl Storz Endoskope, https://www.karlstorz.com/af/en/product-range.htm?d=CORP.

3.     KST is organized as a "GmbH & Co. KG"—a limited partnership ("*Kommanditgesellschaft*" or "KG") with a limited liability company ("*Gesellschaft mit beschränkter Haftung*" or "GmbH") as general partner. (*See* KST Answers to Pls.' 2d Interrogs.

No. 7, Dec. 29, 2015, Dkt. No. 56 Ex. 3.) The general partner GmbH exercises management of the GmbH & Co. KG through managing directors. (*See id.*) Karl Storz Verwaltungsgesellschaft mbH is the sole general partner of KST. (*Id.*)

4.     Dr. Sybill Storz was at all times relevant to this action the sole managing director of both Karl Storz Verwaltungsgesellschaft mbH and KST. (*Id.*)

5.     KST manufactures morcellators (Wehrstein Decl. ¶ 5), and Plaintiffs allege KST manufactured the morcellator used in Ms. Gourdine's surgery (Compl. ¶¶ 12, 20).

6.     KST is the sole owner of KSEA. (KST Answers to Pls.' 2d Interrogs. No. 10, Dkt No. 56 Ex. 3.) KSEA is incorporated under the laws of California. (*Id.*) It was founded in 1971. (Certificate of Status Domestic Corporation, Nov. 9, 2000, Dkt. No. 56-5.) KSEA's headquarters and principal place of business is located in Los Angeles County, California. *USA – El Segundo, CA*, Karl Storz Endoskope, https://www.karlstorz.com/af/en/usa-el-segundo.htm.

7.     KSEA is properly capitalized as an entity separate and distinct from KST. (Decl. of Ali Amiri ¶ 11, July 13, 2015, Dkt. No. 51-3.) KSEA maintains separate records from KST. (Wehrstein Decl. ¶ 9.)

8.     KSEA is covered by a global insurance policy purchased by KST, which KSEA is not in possession of. (KSEA Resp. Pls.' 2d Interrog. No. 4, Jan. 5, 2016, Dkt. No. 56 Ex. 24; *see also* Dep. of Ali Amiri Dep. Tr. 45:6–13, Mar. 8, 2016, Dkt. No. 56 Ex. 1.).

9.     KSEA also has its own insurance policy, which includes KST as an insured. (Policy No. US00006198LI14A Endorsement No. 1, Jan. 1, 2014, Dkt. No. 56 Ex. 17.)

10.    KSEA's by-laws provide for three to five directors. (By-Laws of Storz Endoscopy-America, Inc. art. III § 2, Jan. 18, 1971, Dkt. No. 56 Ex. 27.) However, there were only two directors from 2006 to 2011: Dr. Sybill Storz, managing director of KST, and her son, Karl-

-7-

Christian Storz. (KSEA Answers to Pls.' 2d Interrogs. No. 7, Dec. 29, 2015, Dkt. No. 56 Ex. 6; KST Answers 2d Interrogs. No. 8, Sept. 24, 2015, Dkt. No. 56 Ex. 7.) All board actions from 2006 to 2011 were done by written consent; no board meetings were scheduled in that time. (KSEA's Resp. to Pls.' Req. for Prod. No. 12, Dec. 29, 2015, Dkt. No. 56 Ex. 28.)

11.    Dr. Sybill Storz was president of KSEA until 2004 or 2005, and CEO until 2007 (despite the fact that the by-laws state that the president shall be CEO (By-Laws art. IV § 7)). (*Id.*; Press Release, Karl Storz Endoskope (Mar. 15, 2005), Dkt. No. 56 Ex. 25; KSEA Board Actions KSEA_000106–10, Dkt. No. 56 Ex. 4.)

12.    Mr. Ali Amiri is vice president of marketing at KSEA. (KSEA Board Actions KSEA_000106.) He has been employed with KSEA since his transfer from KST in Germany in 1999. (Amiri Dep. Tr. 77:21–78:14; 106:11–12.)

13.    Mr. Serkan Sezer is vice president of quality control and regulatory affairs at KSEA. (FDA Warning Letter, Dec. 8, 2014, Dkt. No. 35-4 at 5.). He holds an identical position at KST. (Serkan Sezer LinkedIn profile, Dkt. No. 56 Ex. 20.) Apparently, he resides in Germany and he has never worked in the United States. (*Id.*)

14.    KSEA executives travel to Germany annually for business planning purposes, including the creation and review of marketing plans for particular products, including morcellators. (Amiri Dep. Tr. 24:12–27:13.)

15.    KSEA's daily operations are managed by the KSEA executive committee. (*Id.* 62:12–24.) No Storz family members are members of the KSEA executive committee. (*Id.* 62:9–11.) No KST employees are members of the KSEA executive committee. (*Id.* 63:15–20.)

16.    KST does not exercise day-to-day control over KSEA's business operations. (Wehrstein Decl. ¶ 8; Amiri Decl. ¶ 9.)

17.    KSEA is part of Karl Storz North America, an unincorporated grouping of KST subsidiaries in North America. (Amiri Dep. Tr. 85:2–86:10; 100:23–101:3.) KST uses Karl Storz North America to manage its North American operations. (*See id.*; *id.* 93:1–8.)

18.    KSEA is KST's exclusive distributor in the United States for medical endoscopic instruments. (Dkt. Nos. 37 at 4; 25-4 ¶ 5.) KSEA was created for the sole purpose of distributing KST products in the United States. (Ali Amiri Dep. Tr. 114:4–15.)

19.    Karl Storz products comprise 93% of KSEA's sales. (*Id.* 65:5–10.) The remainder of KSEA's sales are third-party products ancillary to Karl Storz products. (*See id.* 50:1–9.)

20.    There is no written distribution agreement between KST and KSEA. (*Id.* 113:23–25.)

21.    There is no written exclusivity agreement between KST and KSEA. (*Id.* 114:9–13.)

22.    There is no written shared marketing services agreement between KST and KSEA. (KST's 1st Supp. Answers to Pls.' 1st Interrogs. 12, Dec. 29, 2015, Dkt. No. 56 Ex. 31.)

23.    There is no written servicing or return to vendor agreement between KST and KSEA. (Amiri Dep. Tr. 112:7–16.) Nonetheless, KSEA routinely returns goods to KST for servicing when "there is a value to sending a product for it to be repaired." (*Id.*)

24.    KST and KSEA share the same market branding. (Brand Identity Guidelines, Dec. 2012, Dkt. No. 56 Ex. 13.)

25.    KST drafts, develops, approves, and controls all morcellator marketing, training, and sales materials used for the marketing of morcellators in the United States. (KST Answers Pls.' 2d Interrogs. No. 10, Dkt. No 56 Ex. 7; KSEA Resp. Pls.' 2d Interrogs. No. 11, Dkt. No. 56 Ex. 24.) Although KSEA has "the final decision on which marketing materials are finally distributed to end users in the United States, including South Carolina," KSEA's only asserted role is to review

-9-

materials for U.S. regulatory compliance. (*See* KST Answers Pls.' 2d Interrogs. No. 10, Dkt. No 56 Ex. 7; KSEA Resp. Pls.' 2d Interrogs. No. 11, Dkt. No. 56 Ex. 24.)

26.    KSEA employs approximately 250 sales representatives. *Information on the sales subsidiary*, Karl Storz-Endoskope, https://www.karlstorz.com/af/en/usa-el-segundo.htm. KSEA also maintains warehouse operations in Massachusetts. (Amiri Dep. Tr. 71:19–73:2.)

27.    KST directed KSEA to market morcellators in all U.S. states. (*See* Amiri Dep. Tr. 47:4–22.)

28.    KSEA markets morcellators in South Carolina. (Amiri Dep. Tr. 109:6–8.)  In the period 2006 to 2011, a KSEA sales representative, Bryan Paylor, was sometimes physically in South Carolina specifically selling morcellators. (*Id.* 118:6–12.)

## IV.    Analysis

Plaintiffs allege that Karl Storz morcellators were unsafe for use in hysterectomies, that Karl Storz morcellators were marketed for and used in hysterectomies within this District, and that Ms. Gourdine was injured as a result.  Plaintiffs allege causes of action under many theories— whether Defendants knew that the morcellators were unsafe for hysterectomies, whether they were negligent in not knowing, whether the morcellator design is defective, whether warranties were breached, whether misrepresentations occurred, etc.  But the crux of Plaintiffs' allegations is that Defendants marketed a product for a particular use, when that product was in fact unsafe for that use.  Plaintiffs concede that the Court has no general jurisdiction over KST, the German manufacturer of the morcellators. (Dkt. No. 56 at 11.)  Defendant KSEA did not challenge—and therefore conceded—personal jurisdiction. *See* Fed. R. Civ. P. 12(h)(1).  So the jurisdictional question before the Court is whether KST was involved with the marketing of morcellators in a way that gives rise to specific personal jurisdiction over KST in the District of South Carolina.

Plaintiffs have had the opportunity for jurisdictional discovery. In responding to KST's motion to dismiss, Plaintiffs now must prove personal jurisdiction over KST by a preponderance of the evidence. Plaintiffs must show that South Carolina's long-arm statute authorizes personal jurisdiction over KST and that the exercise of personal jurisdiction over KST comports with constitutional due process. *Nolan*, 259 F.3d at 215. Because South Carolina has interpreted its long-arm statute to extend to the constitutional limits of due process, the only inquiry is whether due process requirements are met. *ESAB Group*, 34 F. Supp. 2d at 328.

To meet due process requirements, Plaintiffs must prove that KST has "purposefully availed itself of the privilege of conducting activities in the state," that their claims "arise out of those activities," and that "the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Nolan*, 259 F.3d at 215. Plaintiffs' claims arise from the marketing and sale of morcellators; Plaintiffs may show purposeful availment of the privilege of marketing morcellators in South Carolina under three possible theories. First, KST may be directly involved in marketing morcellators in South Carolina. Second, KSEA, which is concededly subject to specific personal jurisdiction in South Carolina, may be an "alter ego" of KST. Third, KSEA may be an agent whose acts in the forum are imputable to KST for jurisdictional purposes. Under any theory, Plaintiffs must also demonstrate the reasonableness of personal jurisdiction in South Carolina.

For the reasons set forth below, the Court holds that it has specific personal jurisdiction over KST in this action under each of the above theories. The Court finds that KST purposefully availed of South Carolina by deliberately marketing and distributing morcellators in South Carolina through its sales agent, KSEA. The Court finds that KSEA is an alter ego of KST. The Court finds that KSEA's contacts with South Carolina are imputable to KST under an agency theory. Each is an independent and sufficient ground for specific personal jurisdiction.

A.     **Direct Availment**

A parent manufacturer's contacts with a forum are "minimum contacts" sufficient for personal jurisdiction over the manufacturer in that forum to satisfy due process only if the parent engaged in some "additional conduct" beyond merely placing the product into the stream of commerce. *Lesnick*, 35 F.3d at 943–47. Such additional conduct may include "[1] designing the product for the market in the forum State, [2] advertising in the forum State, [3] establishing channels for providing regular advice to customers in the forum State, or [4] marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi Metal Indus. Co., Ltd. v. Sup. Court of Cal., Solano Cty.*, 480 U.S. 102, 112 (1987) (O'Connor, J.) (plurality opinion).     Under a direct availment theory, rather than an agency theory, a manufacturer's use of a "sales agent in the forum State" gives rise to personal jurisdiction, not because the agent's acts are imputed to the principal, but because the very act of "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" is in itself an act purposefully directed toward the forum. *See id.* Here, "marketing the product through a distributor" means KST marketed morcellators by employing KSEA as an intermediary in South Carolina, to benefit legally from the protection provided by South Carolina's laws and economically from indirect sales to South Carolina residents. *See Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 659 (4th Cir. 1989). Furthermore, the "marketing" at issue must be directed at South Carolina, not at the United States generally. *See J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2790 (2011). But if the sale of Karl Storz morcellators in South Carolina were "mere fortuity" caused by KSEA's unilateral actions, such sales could not provide the basis for the exercise of personal jurisdiction, even if those sales occurred as part of a KST marketing effort directed at the United States generally. *See id.*; *see also Lake Shore*, 886 F.2d at 659 ("The 'unilateral activity of another party or a third person' cannot satisfy the 'minimum contacts'

requirement of due process." (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 417 (1983))).

The Court finds that KST marketed in South Carolina through KSEA, who agreed to serve as its sales agent in South Carolina. That is sufficient purposeful contact with the forum for personal jurisdiction. *Asahi Metal Indus.*, 480 U.S. at 112 (plurality opinion). KSEA was created for the sole purpose of acting as an intermediary in the United States, to benefit KST legally from the protection provided by American laws and economically from indirect sales to American residents. *See* Findings of Fact ¶ 18. In furtherance of that purpose, KSEA sent a sales representative to South Carolina to solicit morcellator customers, to benefit KST legally from the protection provided by South Carolina laws and economically from indirect sales to South Carolina residents. *See id.* ¶ 28. Although no contract governs the marketing relationship between KST and KSEA—none is needed because the purpose of KSEA is to market KST products (*see id.* ¶¶ 18–25)—it is abundantly clear that KSEA has no autonomy in marketing morcellators. KSEA markets morcellators in South Carolina, *id.* ¶ 28, because KST directs KSEA to market in all U.S. states, *id.* ¶ 27. KST and KSEA share the same market branding. *Id.* ¶ 24. KST drafts, develops, approves, and controls all morcellator marketing, training, and sales materials used for the marketing of morcellators in the United States. *Id.* ¶ 25. Although KSEA has "the final decision on which marketing materials are finally distributed to end users in the United States, including South Carolina," KSEA's only asserted role is to review materials for U.S. regulatory compliance. *Id.* In other words, Karl Storz's U.S. regulatory compliance team is employed by KSEA in the United States, not by KST in Germany.[1] That reasonable arrangement does not bear on the

---

[1] Plaintiffs' attempt to connect compliance with FDA regulations with personal jurisdiction is misguided. KST compliance with FDA regulations may be germane to the merits of a product liability action, but it does not establish specific personal jurisdiction in South Carolina. A great

question of whether KST employed KSEA as its sales agent in South Carolina. The admitted fact that KST "[t]ypically" prepares the marketing, training, and sales materials used by KSEA in South Carolina may be sufficient in itself for the Court to find that KST directly participated in the marketing of morcellators for hysterectomies in South Carolina, but perhaps more important is the fact that it does not appear that KSEA prepares marketing materials at all. Defendants artfully state that "KSEA may generate marketing, training, and sales material in support of US market needs" (KST Answers Pls.' 2d Interrogs. No. 10, Dkt. No 56 Ex. 7; KSEA Resp. Pls.' 2d Interrogs. No. 11, Dkt. No. 56 Ex. 24), but since there is no contract between KST and KSEA governing shared marketing services, KSEA "may" do whatever KST tells it to do. More significant is Defendants' careful wording to avoid stating that KSEA has ever generated marketing materials. On the record before the Court, it appears more likely than not that KST generates all or nearly all marketing, training, and sales materials and that KSEA's role regarding marketing materials is entirely or almost entirely limited to regulatory compliance.

Because the Court's reasoning relies in significant part on Justice O'Connor's plurality opinion in *Asahi*, examination of this case in light of *J. McIntyre*, a more recent Supreme Court opinion "provid[ing] greater clarity" regarding the "imprecision arising from *Asahi*," is obligatory. *J. McIntyre Mach.*, 131 S. Ct. at 2786. In *Asahi*, the Supreme Court divided between a four-Justice opinion written by Justice Brennan, concluding that a manufacturer's awareness that its products are marketed in the forum is sufficient for personal jurisdiction, and a four-Justice opinion authored by Justice O'Connor, concluding that personal jurisdiction requires action purposefully directed toward the forum. *Id.* at 2788–89. In *J. McIntyre*, the Court rejected Justice Brennan's opinion as

---

many products require various federal approvals as prerequisites to access to the U.S. market, *e.g.*, automobiles, tires, aircraft parts, pharmaceuticals, cosmetics, firearms, pesticides, even food. Compliance with those regulations is not an activity directed at South Carolina.

"inconsistent with the premises of lawful judicial power" and adopted a position "consistent with Justice O'Connor's opinion." *Id.* at 2789, 2790.  In so doing, it held that New Jersey courts could not exercise personal jurisdiction over a British manufacturer in a product liability case, where a U.S. distributor not under the manufacturer's control, but which "structured [its] advertising and sales efforts in accordance with J. McIntyre's direction and guidance whenever possible," sold a machine that, through the operation of a "nationwide distribution system," fortuitously happened to be used in New Jersey. *Id.* at 2786.  The New Jersey Supreme Court had held that New Jersey courts could assert personal jurisdiction over the manufacturer because it had placed the machine into the stream-of-commerce without taking "some reasonable step to prevent the distribution of its products in this State." *Id.*  The U.S. Supreme Court held that to be error because the manufacturer "had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State" and did it "not have a single contact with New Jersey short of the machine in question ending up in" New Jersey. *Id.* at 2790.  The fact that the manufacturer directed marketing and sales efforts at the United States generally did not support personal jurisdiction in New Jersey.

In contrast, KSEA is a distributor wholly owned by KST, which sent a sales representative to South Carolina to solicit morcellator customers with KST-authored marketing materials.  There is no evidence that KST directed KSEA to send a particular sales representative to South Carolina on a particular date, but KST directed KSEA to solicit sales in South Carolina, along with every other states. *See* Finding of Fact ¶ 27.  KSEA did not decide in which states it would or would not sell morcellators; and the fact that morcellator sales were solicited in South Carolina was not the fortuitous result of unilateral action by KSEA.  KST, through its control of KSEA's morcellator distribution and marketing, deliberately availed itself of South Carolina.

A first glance, this Order may appear inconsistent with the Court's order of November 6, 2015, which held that "KST is not subject to personal jurisdiction on the basis of its own actions." (Order 13, Dkt. No. 42.). To read this Order as inconsistent with that previous order, however, would be a mistake; the two orders accord fully. Though KST is the movant, Plaintiffs bear the burden of persuasion on a motion to dismiss for lack of jurisdiction. The order of November 6, 2015 found the arguments Plaintiffs presented in their brief of October 5, 2015 (Dkt. No. 37) unpersuasive, and so the Court held that Plaintiffs failed to carry their burden. Plaintiffs argued that persons employed by KST marketed morcellators in South Carolina, based on the wording of some former KSEA employees' Linkedin pages. (Dkt. No. 37 at 5.) Plaintiffs argued that generic warranty instructions included with products present in South Carolina were sufficient KST contacts with South Carolina. (*Id.* at 11.) Plaintiffs made the same argument regarding the accessibility of KST's website from South Carolina (*id.*), and regarding the fact that KST has an insurance policy that includes KSEA (*id.* at 13). Plaintiffs argued that personal jurisdiction was appropriate because "Karl Storz Endoscopy" funded grants at the Medical University of South Carolina, even though financial documents listed KSEA, not KST, as the donor. (*Id.* at 21.) Plaintiffs made the legally erroneous argument that merely placing morcellators in the stream of commerce with a reasonable expectation that they would end up in South Carolina (the argument rejected by the Supreme Court in *J. McIntyre* in 2011, and by the Fourth Circuit in *Lesnick* in 1994). (*Id.* at 14–15.) Those arguments remain unpersuasive; nothing in this Order suggests, or should be taken to suggest, otherwise. This Order is consistent with the Court's previous rejection of those arguments and its denial of the motion to dismiss without prejudice so that the motion to dismiss could be re-argued after complete jurisdictional discovery. Moreover, the Court ordered further discovery on the question of whether KSEA's contacts with South Carolina could support

personal jurisdiction over KST because it was readily apparent that employees of the German entity were not traveling to South Carolina to sell morcellators (KST had created a U.S. subsidiary to do that). Now, after jurisdictional discovery, the Court finds that KSEA's activities in South Carolina do justify the exercise of personal jurisdiction over KST—not only because KSEA's actions are imputable to KST, but also because KST directly and purposefully availed itself of South Carolina by employing a sales agent (KSEA) who physically operated within South Carolina.

## B.    Derivative Availment

Personal jurisdiction over KSEA is conceded. Therefore, the actions of KSEA may allow an exercise of personal jurisdiction over KST, even if KST itself had not purposefully availed of South Carolina, if the acts giving rise to personal jurisdiction over KSEA may be imputed to KST. The acts giving rise to personal jurisdiction over KSEA are the marketing and sale of morcellators in South Carolina through a KSEA-employed sales representative physically present in the forum. Those acts may be imputed to KST under two theories. First, under an equitable doctrine of corporate law, KSEA may be an alter ego of KST. Second, under agency law, KSEA may be an agent of KST. The Court finds KSEA's actions in South Carolina imputable to KST under either theory.

### 1.    Alter Ego

As an initial matter, the Court must determine what law to apply to the question of whether equity requires that the Court assert personal jurisdiction over KSEA's shareholder, KST, in disregard of KSEA's corporate form. "[A] federal court sitting in diversity must apply the choice of law rules of the state in which it sits." *Joye v. Heuer*, 813 F.Supp. 1171, 1173 (D.S.C. 1993) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). South Carolina Code section 33-9-110(6)(c) provides that the laws of the state under which a domesticated foreign

-17-

corporation is organized governs the liability of its shareholders to the extent liability arose before

domestication. KSEA has never been domesticated in South Carolina; any liability therefore

necessarily arose before domestication and so the law of California, KSEA's state of incorporation,

controls the alter-ego question in this case. The application of California law is consistent with

the internal affairs doctrine that many states apply the law of the state of incorporation to the issue

of whether to pierce a corporation's veil. *See In re Heritage Org., L.L.C.*, 413 B.R. 438, 510

(Bankr. N.D. Tex. 2009) (applying internal affairs doctrine to determine that Delaware law

governed the question of whether to pierce the veil of a limited liability company created under

Delaware law); *see generally* 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of

Corporations § 43.72.

        To establish that KST is liable for KSEA's acts under the California's alter ego doctrine,

Plaintiffs must show that there was "such unity of interest and ownership that the separate

personalities of the corporation and the individual no longer exist" and "that an inequitable result

will follow if the acts complained of are treated as those of the corporation alone." *Riddle v.

Leuschner*, 335 P.2d 107, 110 (Cal. 1959); *Automotriz Del Golfo De California S. A. De C.V. v.

Resnick*, 306 P.2d 1, 3 (Cal. 1952); *Minifie v. Rowley*, 202 P. 673, 676 (Cal. 1921). Application

of the alter ego doctrine does not mean that one company is liable for the acts of another company

because there is really only one company—both exist as separate entities and the parent's limited

liability is disregarded only to such extent as the ends of justice require in the present case. *Mesler

v. Bragg Mgmt. Co.*, 702 P.2d 601, 607 (Cal. 1985).

        California's alter ego test encompasses a great many factors:

        [1] [c]omingling of funds and other assets, failure to segregate funds of the separate
        entities, and the unauthorized diversion of corporate funds or assets to other than
        corporate uses . . .; [2] the treatment by an individual of the assets of the corporation
        as his own . . .; [3] the failure to obtain authority to issue stock or to subscribe to or

-18-

issue the same . . .; [4] the holding out by an individual that he is personally liable for the debts of the corporation . . .; [5] the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . [6] *the identical equitable ownership in the two entities*; [7] *the identification of the equitable owners thereof with the domination and control of the two entities*; [8] *identification of the directors and officers of the two entities in the responsible supervision and management*; [9] *sole ownership of all of the stock in a corporation by one individual or the members of a family* . . .; [10] the use of the same office or business location; the employment of the same employees and/or attorney . . .; [11] the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . .; [12] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . .; [13] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . .; [14] *the disregard of legal formalities and the failure to maintain arm's length relationships among related entities* . . .; [15] the use of the corporate entity to procure labor, services or merchandise for another person or entity . . .; [16] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . .; [17] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . [18] and the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 249–50 (Dist. Ct. App. 1999) (quoting *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal. App. 2d 825, 838–40 (Dist. Ct. App. 1962) (numbering modified and emphasis added). Not every factor will be present in any given case: the "conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one." *Associated Vendors*, 210 Cal. App. 2d at 836–37. Equity is the most important consideration. *Mesler*, 702 P.2d at 607 ("The essence of the alter ego doctrine is that justice be done."); *see also Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 176 (4th Cir. 1998) (applying federal common law). But a showing of fraud or wrongdoing is not necessary; rather, "it is sufficient that it *appear* that recognition of the acts as those of a corporation only will produce

inequitable results." *Associated Vendors*, 210 Cal. App. 2d at 837 (emphasis added); *cf. Fletcher v. Atex, Inc.* 68 F.3d 1451, 1458 (2d Cir. 1995) ("[A] showing of fraud or wrongdoing is not necessary under an alter ego theory, but the plaintiff must demonstrate an overall element of injustice or unfairness.") (applying Delaware law). The inequity, however, must flow from the misuse of the corporate form. *S.C. Elec. & Gas Co. v. UGI Utilities, Inc.*, Civ. No. 2:06-02627-CWH, 2012 WL 1432543, at *62 (D.S.C. Apr. 11, 2012) (citing *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993) (applying federal common law)).[2]

To succeed on an alter ego theory, Plaintiffs must show "such unity of interest and ownership that the separate personalities of" KST and KSEA "no longer exist." The Court finds that Plaintiffs have met that burden. Several factors that California courts weigh in favor of an equitable disregard of the corporate form are present in this case. KSEA and KST have identical equitable ownership—all KSEA stock is owned by an entity owned by the Storz family. Findings of Fact ¶ 1–4. The Storz family dominates and controls both KST and KSEA—Dr. Storz is the sole managing director of KST, and the KSEA board consists of Dr. Storz, her son, and a seat that has been vacant for ten years. *Id.* ¶ 10. There is also considerable "identification of the directors and officers of the two entities in the responsible supervision and management" of KST and KSEA. Dr. Storz herself was president of KSEA until 2004 and CEO until 2007 (perhaps unaware that the by-laws required the president to be CEO). *Id.* ¶ 11. KSEA's vice president for marketing was employed by KST in Germany until he was transferred to KSEA in 1999. *Id.* ¶ 12. KSEA's vice present for quality management and regulatory affairs holds the same position at KST. *Id.* ¶ 13.

---

[2] For this reason, Plaintiffs' arguments regarding loans from KSEA to KST, repaid by offsets to dividend distributions, are irrelevant to the alter ego analysis in this case.

Strikingly, KSEA has been KST's exclusive U.S. distributor for 35 years and KST products comprise 93% of KSEA's revenues, yet there is no distribution agreement and no exclusivity agreement. *Id.* ¶¶ 20–21. KST creates all marketing, sales, and training materials for the products comprising 93% of KSEA's revenues and KSEA distributes those marketing and sales materials throughout the United States, yet there is no shared marketing services agreement. *Id.* ¶ 22. KSEA routinely returns goods to KST for servicing, yet there is no servicing or return to vendor agreement. *Id.* ¶ 23. Those facts are not indicative of an arms-length relationship between separate companies. When KSEA's vice president for marketing was asked about the lack of any such agreements, he testified, "KSEA was founded for the purpose of distributing Karl Storz products so, as such, I think the purpose makes it clear what we are here for. . . . Yeah, that's the understanding and why Karl Storz Endoscopy-America was founded." (Amiri Dep. Tr. 114:4–13.) In other words, there is no need for written agreements because KST and KSEA share a unity of interest—both exist to sell KST products—and a unity of ownership—the Storz family. A distribution agreement, an exclusivity agreement, or a marketing services agreement between KSEA and KST would be nothing more than the Storz family contracting with itself.

The Court therefore finds unity of interest and ownership between KST and KSEA sufficient for KSEA to be an alter ego of KST in this case. But Plaintiffs must do more than show a unity of interest and ownership between KST and KSEA; they must also show that treating KSEA separately from KST results in inequity or at least the appearance of inequity. That, however, is an easy burden to meet on the facts of this case. It at least appears inequitable to excuse from a product liability action the party that designed the product, manufactured the product, developed the product's marketing and sales materials, and solely owned and controlled the sales agent who entered the forum to sell the product, on the basis of a legal separation between manufacturer and

-21-

distributor insufficient to warrant any written distribution, exclusivity, servicing, or marketing agreement between them. KST's argument that KSEA and KST are separate enough to shield KST from potential U.S. liability regarding its products, yet not so separate as to need written agreements regarding those products, is too strained for the Court to accept. Thus, the Court finds it appropriate to disregard KSEA's corporate form and to assert personal jurisdiction over KST under an alter ego theory.

2.    Agency

In diversity cases, courts look to the forum choice of law rules to decide what substantive law on agency applies to the question of whether a subsidiary acts as the agent of the parent. *Joye*, 813 F.Supp. at 1173 (D.S.C. 1993) *see also, e.g., In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1107 (S.D. Cal. 2011); *Bilyeu v. Johanson Berenson LLP*, 2010 WL 3896415, at *9 (W.D. La. Sept. 30, 2010); *Hitachi Med. Sys. America, Inc. v. Branch*, 2010 WL 816344, at *5 (N.D. Ohio March 4, 2010); *Time, Inc. v. Simpson*, 2003 WL 23018890, at *2–3 (S.D.N.Y. Dec. 22, 2003). The inquiry here is not what substantive law of tort governs. South Carolina's choice of law principles hold that the *lex loci delicti* determines the substantive law governing a tort action. *Boone v. Boone*, 546 S.E.2d 191, 193 (S.C. 2001). The inquiry is what substantive law of agency governs the relationship between KSEA and KST. The acts at issue are not the acts giving rise to the alleged injury, but the acts giving rise to the alleged agency.

Agency is an agreement between the principal and agent. Restatement (Second) of Agency § 15 (1958) ("An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act."). South Carolina's choice of law principles hold that, in the absence of a contractual choice of law provision, the *lex loci contractus* determines the substantive law governing a contract. *Russell Corp. v. Gregg*, No. 2005-UP-556, 2005 WL 7084813, at *3 (S.C. Ct. App. Oct. 17, 2005) (citing

-22-

*Livingston v. Atl. Coast Line R.R.*, 180 S.E. 343 (S.C. 1935)). As noted above, there is no written agreement between KSEA and KST regarding marketing or distribution. Thus, any agency agreement between KSEA and KST regarding the marketing or distribution of morcellators would be an unwritten agreement. The task then is "to determine the place of the principal event, if any, which, under the general law of Contracts, would result in a contract." Restatement (First) of Conflict of Laws § 311 com. d (1934).

The record in this case permits only two plausible *leges locorum contractuum*—Germany (where KST is located) or California (where KSEA is located). If the agreement were made in California, California's agency law would apply. European Union law applicable in Germany holds that the law of the agent's domicil—here, California—governs an unwritten agency agreement. *See* Regulation (EC) No. 593/2008 of the European Parliament and the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I), arts. 4.1(b) & 4.2, 2008 O.J. (L. 177/6).[3] Under the doctrine of *renvoi*, "when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules." *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1302 (Md. 1995) (citations omitted). This doctrine is controversial because of fears that it may lead to a circular or infinitely regressing analysis. *See Weiss v. La Suisse*, 313 F. Supp. 2d 241, 244

---

[3] This European rule applies to contracts after December 17, 2009. Rome I art. 29. For earlier contracts having no explicit choice of law provision, the German Conflict of Law Code provided that the applicable law is the law of the country with which the contract is most closely connected. Einführungsgesetz zum Bürgerlichen Gesetzbuche [EGBGB] [Introductory Statute to the Civil Code], art. 28. The Court concludes that application of EGBGB article 28 also would result in the selection of California law, as an agreement for a California company to act as a distributor and marketing and sales agent in the United States clearly is connected more closely to California than to Germany.

(S.D.N.Y. 2004) (courts should "avoid the dreaded renvoi"); *Adams v. Alliant Techsystems Inc.*, 218 F. Supp. 2d 792 (W.D. Va. 2002) (noting that an Eastern District of New York decision "embraces the controversial renvoi doctrine, which the court finds problematic"); *Breslin v. Liberty Mut. Ins. Co.*, 341 A.2d 342 (N.J. App. Div. 1975) (stating that New Jersey rejected the *renvoi* "doctrine because of its inherent capacity for confusion and unending circular process"). The doctrine is rejected by the Restatement (First) of Conflict of Laws § 7 but allowed in some circumstances by the Restatement (Second) of Conflict of Laws § 8.

The Court finds no South Carolina case law either adopting or rejecting the *renvoi* doctrine. Nonetheless, the Court concludes that the South Carolina Supreme Court would apply *renvoi* where it results in the application of U.S. law rather than that of a foreign country. It would be nearly absurd to apply a foreign country's substantive law to an issue regarding the jurisdiction of U.S. courts, when the foreign country's choice-of-law rules refer the issue back to American law. This is a narrow and exceptional situation; the Court does not conclude that South Carolina would apply *renvoi* when the question is a choice of law between U.S. states.

If the *locus contractus* was in California, then, under South Carolina's choice-of-law rules, California agency law applies. If it was in Germany, then, by application of a very narrow *renvoi* exception to South Carolina's *lex loci contractus* rule, California's agency law applies. The Court therefore does not need to determine the location of the principal event resulting in a purported agency agreement between KSEA and KST (an impossible task on the record before the Court) to conclude that the California's substantive law on agency governs any agency relationship between KSEA and KST.

Under California law, even if KSEA is not an alter ego of KST, its "contacts may be imputed to parent . . . where the subsidiary acts as the general agent of the parent." *Harris Rutsky*

-24-

*& Co. Ins. Serv., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). An agency relationship "is typified by parental control of the subsidiary's internal affairs or daily operations." *Doe, I v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2003). "[A]n agency analysis and an alter ego analysis . . . are different and must be evaluated independently." *Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr. 2d 824, 837 (2000).

"[N]either ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business." *Sonora Diamond*, 99 Cal. Rptr. 2d at 837 (citing *Cannon Mfg. Co. v. Cudahy Packing Co.* 267 U.S. 333, 336 (1925)). "[I]nterlocking directors and officers, consolidated reporting, and shared professional services" are "normal and expected from the status of ownership." *Id.* at 838. But "where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent." *Id.* "[T]he question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles." *Id.* "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Id.* at 839.

The *Sonora Diamond* court stated that the "jurisdiction acquired by the forum state under this rationale is general." 99 Cal. Rptr. 2d at 838. Of course, where the jurisdiction over the

subsidiary is merely specific, it follows that jurisdiction over the parent is likewise specific. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 759 n.13 (2014). The court's point was that the level of control required for imputation of a subsidiary's contacts with the forum is such that the parent can be fairly said to be "at home" wherever the subsidiary is "at home." *Cf. Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). That point underlines the difference between imputing an agent's contacts with the forum under agency law, where the parent's control over the subsidiary is such that the parent is at home wherever the subsidiary is at home, and purposeful availment by "marketing the product through a distributor who has agreed to serve as the sales agent in the forum," *Asahi Metal Indus.*, 480 U.S. at 112 (1987), which is merely an act executing a decision to sell products in the forum.

The jurisdictional rule that a subsidiary's forum contacts may be imputed to the parent, if the parent directed the subsidiary's operations, closely parallels the general rule in tort that a parent may be held directly liable as a primary wrongdoer on the ground that the parent directed the subsidiary's operations. *See United States v. Bestfoods*, 524 U.S. 51, 61–65 (1998) ("[E]xercise of the control which stock ownership gives . . . will not create liability beyond the assets of the subsidiary."). Likewise, personal jurisdiction over a parent something more than mere ownership of a subsidiary that acted within the forum. However, as the Supreme Court noted in *Bestfoods*, it can be difficult to distinguish ownership of a subsidiary from direction of a subsidiary's activities. *See* 524 U.S. at 66. In *Bestfoods*, the question was whether the parent directly participated in the operation of a particular physical plant, within the meaning of a particular statute. *Id.* Here, the analogous question is whether the parent, KST, directly participated in the distribution and marketing morcellators in South Carolina.

-26-

The Court finds that KST, although KST deliberately availed itself of South Carolina through its use of KSEA's as a sales agent in South Carolina, its control over KSEA was not the degree of day-to-day control required to impute KSEA's presence in South Carolina to KST. Plaintiffs have simply failed to prove that KST took over the performance of KSEA's day-to-day operations. The level of control Plaintiffs have demonstrated—policy and planning direction, interlocking boards and officers, shared branding, shared insurance coverage—are not untypical of a normal parent-subsidiary relationship. *See* Findings of Fact ¶¶ 8–14, 24. No Storz family members or KST employees are on the executive committee that controls KSEA's daily operations, *id.* ¶ 15, and Plaintiffs certainly have not shown by a preponderance of evidence that KSEA executives testified falsely when they declared that KST does not exercise day-to-day control over KSEA's business operations, *see id.* ¶ 16. The use of an intermediate Karl Storz North America grouping to manage all of KST's North America subsidiaries further implies separation between KST and KSEA's daily operations. *See id.* ¶ 17.

However, California agency law provides another theory for imputing KSEA's contacts to KST. "Under California law, the representative services doctrine permits a court to exercise jurisdiction over a foreign company 'when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's own business.'" *Allphin v. Peter K. Fitness, LLC*, Civ. No. 13-1338-BLF, 2014 WL 6997653, at *5 (N.D. Cal. Dec. 11, 2014) (quoting *Sonora Diamond*, 99 Cal. Rptr. 2d at 839–40). When "a parent uses a subsidiary to do what it otherwise would have done itself," the subsidiary's contacts with the forum may be imputed to the parent. *Id.* The doctrine applies only to operating company parents, not to holding companies, *id.*, and is a feature of the agency law of many states, *In re Hydroxycut Marketing & Sales Practices Litig.*, 810 F. Supp. at 1116 ("Under the laws of a number of states, a subsidiary is

deemed to be acting as the agent of the parent if the subsidiary engages in activities that, but for the existence of the subsidiary, the parent would have to undertake itself.").

There is no dispute that KST is not a passive holding company. KST's business is to design, manufacture, and sell medical devices. KESA assists KST by marketing and distributing Karl Storz (and only Karl Storz) endoscopic instruments within the United States. Findings of Fact, ¶¶ 18–19. To that end, KST and KSEA share the same market branding, KST drafts all marketing, training, and sales materials used by KSEA, and KST directs KSEA to market its products in all U.S. states. *Id.* ¶¶ 25, 27, 28. KST has similar subsidiaries in other markets around the world. *See Karl Storz Locations Worldwide*, Karl Storz Endoskope, https://www.karlstorz.com/af/en/headquarters-worldwide.htm. KST manages those subsidiaries collectively. *See, e.g.*, Findings of Fact ¶ 17. As in *Hydroxycut Marketing and Sales Practices Litigation*, here "[i]t is clear that one business enterprise has been divided into numerous parts that work together and depend on each other." 810 F. Supp. 2d at 1118 (holding that plaintiffs made a sufficient showing that a U.S. subsidiary was acting as an agent of its foreign parent under a "but-for" (representative services) theory). That is why the basic agreements typical in a manufacturer-distributor relationship between separate enterprises are absent as between KST and KSEA. *See id.* ¶¶ 20 (no distribution agreement), 21 (no exclusivity agreement), 22 (no marketing services agreement, 23 (no servicing or return to vendor agreement). The services of KST subsidiaries such as KSEA are essential to Karl Storz's unitary enterprise of selling Karl Storz products. *See* Findings of Fact ¶ 2. The Court therefore finds that KSEA was acting as KST's agent under a representative services theory.

### C.   Reasonableness of Personal Jurisdiction

As explained above, KST's has "minimum contacts" with South Carolina sufficient for this Court to exercise personal jurisdiction over it, and Plaintiffs' causes of action arise from those

contacts—the marketing and sale of morcellators—with South Carolina. "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). The "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Id.* at 477–78; *see also Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993). Courts consider the reasonableness of jurisdiction by considering "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering substantive social policies." *Lesnick*, 35 F.3d 939, 946 (4th Cir. 1994) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). These factors apply with particular force in actions against foreign national defendants. *Asahi*, 480 U.S. at 115. The Court must "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." *Id.*

After careful consideration of the factors outlined in *Lesnick*, the Court also finds that the exercise of personal jurisdiction over KST is reasonable. KST created a wholly-owned U.S. subsidiary for marketing its products, including morcellators, in the United States. Findings of Fact ¶¶ 6, 18. That entity employs over 250 sales representatives across the United States. *Id.* ¶ 26. It also maintains warehouses in the United States. *Id.* KST insures those U.S. operations. *Id.* ¶ 8. Defending an action arising from those operations in a U.S. court is a reasonable burden for KST to bear. Indeed, given that KST insures KSEA and ultimately pays litigation costs as a reduction of KSEA's earnings available for distribution, the major incremental burden on KST of

-29-

defending itself in this action is unclear, beyond the possibility of discovery of records and witnesses located in Germany.

However, plaintiffs allegedly injured within the United States by defective or misrepresented medical products sold within the United States cannot reasonably be expected to litigate in the foreign place of manufacture. The alleged injury in this case occurred in America because Karl Storz came to America, not because Plaintiffs went to Germany. U.S. states' interest in protecting their citizens from foreign-manufactured medical devices is no less than their interest in protecting their citizens from domestic products. Where those products are present and used in a forum state because of the manufacturer's deliberate marketing strategy, rather than fortuitously, it is reasonable for a forum state to assert personal jurisdiction over the manufacturer.

The Court also finds that this case does not substantially touch on any German substantive or procedural polices. Plaintiffs allege that a South Carolina resident was harmed by a morcellator made in Germany but marketed and sold in South Carolina by a sales representative in South Carolina, which was then used in South Carolina in a way allegedly causing the harm. The substantive law applicable to the allegations is South Carolina tort law, not German delict law. The Court finds that South Carolina's interest in adjudicating that allegation is greater than Germany's interest. Moreover, if German procedural law applied to the jurisdictional question, KST would be subject to personal jurisdiction in the United States. *See* Zivilprozessordnung [ZPO] [Code of Civil Procedure Code], §§ 21, 23; Bundesgerichtshof [BGH] [Federal Court of Justice] Sept. 5, 2012, VII ZR 25/12 (affirming denial of an appeal from a district court decision that German courts had jurisdiction over a dispute between a Virginia company and a German sales agent because the Virginia company owned stock in a German subsidiary). As discussed above, German choice-of-law rules would apply California's substantive agency law to the

-30-

relationship between KSEA and KST even if the agency *locus contractus* were in Germany. German law obviously does not control the jurisdiction of U.S. courts, but it is a strong indication of German procedural policy interests. Here, German law disclaims a procedural policy interest. A German company should hardly be surprised if haled into court in a venue in which it would be subject to personal jurisdiction under German law.

KST does not argue that some alternate U.S. jurisdiction would be more reasonable than South Carolina. Indeed, it appears uncontested that personal jurisdiction South Carolina is as reasonable as personal jurisdiction in any other state where a Karl Storz morcellator was used in a hysterectomy.[4]  The reasonableness question thus is whether it is reasonable for any American court to assert personal jurisdiction over KST regarding the marketing or sale of Karl Storz morcellators within that court's territorial jurisdiction.

Finally, the "efficient resolution of controversies as between states" weighs in favor of personal jurisdiction over KST in South Carolina. KST argues that if KST is dismissed from the case, "Plaintiffs can still obtain relief in South Carolina" because "the case would still proceed against KSEA." (Def.'s Sur-Reply Supp. Mot. Dismiss 15, Mar. 25, 2016, Dkt. No. 60.) Moreover, dismissing KST would not truly remove KST from this action: KST insures KSEA, and KST is the sole owner of all of KSEA's assets and liabilities. Findings of Fact ¶¶ 3, 7. The Court finds it highly unlikely that KST has any design to avoid a possible adverse judgment by fleeing the American market. Dismissing KST indeed would not deny Plaintiffs relief in South Carolina—it would just make relief in South Carolina very inefficient, perhaps prohibitively so,

---

[4] The Central District of California might well be a more *convenient* forum. KSEA is located there; presumably, many relevant records and fact witnesses are located there as well. KST has consented to personal jurisdiction in California in matters unrelated to the instant case. *E.g.*, Answer, *Novadaq Techs. v. Karl Storz GmbH & Co. KG*, Civ. No. 5:14-4853-PSG (N.D. Cal. Jan. 2, 2015), Dkt. No. 22.

as jurisdiction over KSEA but not KST could impede merits discovery significantly. Allowing claims to proceed only against a wholly-owned distributor that does not even draft marketing materials is unlikely to result in an "efficient resolution" of product liability claims.

The Court therefore finds that it is reasonable to exercise specific personal jurisdiction over KST in this case.

**V.**    **Conclusion**

For the foregoing reasons, the Court **DENIES** KST's motion to dismiss (Dkt. No. 51).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

May 2, 2016
Charleston, South Carolina